Our second case for argument today is Paschall v. Tube Processing Corporation. Mr. Macy. Good morning, and may it please the Court, my name is Jeff Macy, and I represent the appellants Ashaki Paschall and Gerald Ragland. This is a hostile work environment case, Title VII, 42 U.S. 1981. I'd like to focus, obviously there are two issues, whether the environment itself was objectively hostile, and then also whether the employer should bear any liability for the environment, assuming it was hostile. I'd like to initially start by pointing out to what I believe is an error of law that is creeping in, both to the appellee's brief and also at the district court's opinion. In their brief, or its brief, the appellee says, as a matter of law, two instances of co-workers using the N-word are insufficient. And in its opinion, the district court indicated in footnote 4 that it felt constrained by binding precedent on the objectively hostile prong to find against my clients, and suggested possibly revising or revisiting this court's precedence on objectively hostile in light of current social movements. And with respect to district court, I understand its position on that, but I think that's incorrect and I think it's based on a misinterpretation that lines up with the appellee's contention that as a matter of law, two instances of co-workers using the N-word are insufficient. There's no matrix where you can plot, I think there's sort of a suggestion that you can plot on an x-axis the number and severity of instances, and on the y-axis the power of the person making the offensive comment. And that this is like a mathematical equation, that if it's a supervisor, just a few instances are okay, but if it's a co-worker, you need five instances. That's not how the case law works. If the court looks at its Baskerville opinion, the court's been clear that there's no bright line. All of these cases depend on a factual determination, and the reasonability of people like my clients' experience of offensive comments is essentially a jury question. In Baskerville, the court said, look, if the court is uncertain on which side of a line conduct lies, it's a matter for the jury. And in this case, particularly given the circumstances and just the voluminous testimony of my clients, the hostility of the environment, even the objective hostility, is a jury question. And that's because, frankly, some of the conduct that they testified to and I think is undisputed is offensive enough that a jury could find that it was created in an objectively hostile environment. Mr. Macy, can you focus, though? I understand that point. I think you've articulated it well. But can you transition to a focus on the employer's response to what happened and why that's not adequate? In other words, why in light of the tube company, tube processing, in light of their response, why do we have a jury issue left? Thank you. I agree. I think that's the key issue in the case. And I think if that's the issue that needs to be decided, then the hostile work environment doesn't necessarily need to be reached. I would suggest that it depends on the window that the court looks at. The defendant points very clearly to the window after my client, Ashaki Pascal, complained about the conduct of her second trainer, Barb Odom, and the comment she made about using the N-word to describe what she has claimed was Brazilian nuts. From that point forward, the defendant would like to direct the court's attention. We raised below and we raised here is we think the window is the moment where Ashaki Pascal was assigned to train with her first trainer, John Benash, and then was moved to Barb Odom as her second trainer. The question in my mind is whether the employer had knowledge or should have had knowledge that this type of behavior on both Benash's and Odom's part would occur. And I think the key question is because, of course, what we're trying to do is not hold the employer liable for incidents it's not aware of. But I just wanted to point out just some facts about what the defendant knew prior to Ashaki Pascal's less than two-month stint in that vending department at 2 Processing. First, it did know that John Benash had made sexist comments to a prior employee, Angela Phillips. That information is in her declaration, which we submitted in the record. Also, if you look at Ms. Pascal's deposition on page 9 and 10 of the docket, Sid Young, the HR representative, clearly acknowledges that he was aware of complaints from Ms. Phillips. And then also my other client, Gerald Ragland, about Mr. Benash prior to that, prior to Ms. Pascal ever being assigned to train with him. Second, it knew that John Benash had already had a complaint made by Gerald Ragland in which there was a physical altercation. It also knew that in the fact this knowledge is also established by the discipline it issued to Mr. Benash, which is already in the record, and in that discipline it references multiple complaints. The defendant's contention is there's no evidence that these complaints were specifically tied to race or sex discrimination. But if you look at the record, especially Ms. Phillips' testimony, there's ample evidence from which a jury could infer that there had been explicit complaints about Mr. Benash, race and sex discrimination, prior to Ms. Pascal being assigned to train. She complains. It drives her to the restroom. She's crying. She has to switch jobs for a day. And then is assigned to another trainer by the company, and that trainer starts using the N-word. Again, there's evidence that the propensity of that second trainer to be racist was known to the company prior to Ms. Pascal being moved there. And it's particularly significant that she was moved to a second racist trainer after already complaining about the first one. From that evidence, if you look at that window, we contend that the first decision to even assign Ms. Pascal to that area was negligent and was sufficient to meet the standard for employer liability under Title VII in 1981. And I'm going to reserve the rest of my time. Thanks. Certainly, counsel. Mr. Swigert. Yes. May it please the Court. My name is Dave Swigert, and I represent the appellee in this case to Processing Corporation. The issues in this case essentially revolve around whether the lower court correctly decided that Raglin provided insufficient evidence to support his claim of hostile environment, race discrimination, and whether Ms. Paschal provided insufficient evidence to support her claims of both sexual and racial harassment. In support of our position that Judge Magnus Stinson got it right on all three claims in her painstaking 51-page opinion analyzing all allegations and all arguments made by both plaintiffs under well-settled Supreme Court and Seventh Circuit precedents, there are two compelling legal observations, and we've alluded to both of them. First, in our position, under no reasonable definition of severe or pervasive could the boorish and insensitive statements of other coworkers in this case about which either plaintiff complained amount to actionable hostile work environment harassment, except in their own minds. And secondly, there's plainly no basis for employer liability in this case. True processing – indeed, true processing did everything it possibly could to first prevent any co-employee sexual or racial harassment, and then as soon as the issues were brought to its attention, it did what it should do. That is, it undertook a thorough investigation and it undertook remedial efforts aimed at preventing a recurrence. What about Mr. Macy's point that, look, the problem is in the assignment of Banach and Odom in the first instance? That's a very good point. Let's take a look at that. In terms of Mr. Banach, there really was nothing that true processing was ever aware of other than generalized complaints that he argued with employees, that he was not a good supervisor, that he created conflicts with subordinates prior to the incident involving Ms. Paschall. And what the plaintiff has tried to do in setting out this idea that Mr. Banach should really have been a problem that didn't exist in that workplace and nothing that should have confronted Ms. Paschall is to point to a declaration that Angela Phillips made, and we did not see until the reply brief in the case below. Nonetheless, it's very clear from that declaration that the complaint that she made about Mr. Banach did not come until after Paschall had already left true processing. What is very important that hasn't been discussed is that true processing in the first instance put together and promulgated a model sexual and racial harassment policy. That policy spelled out clear examples of what would not be tolerated. It said that it would not be tolerated by any co-employees. Most importantly in this situation, it did what an employer should do through that policy and had a narrow reporting mechanism. If you felt that that policy was being violated, you could report it to one of two people, the general manager, Mike Gill, or the head of human resources, Terry Girth, Tracy Girth. With respect to Ms. Phillips, it's clear from her affidavit that initially she felt that Banach had been upsetting to her, claimed to have authority over her, a big showboat. Nothing there, of course, relates to race or sex, but then she goes on to say, well, I did say something to my supervisor and a co-worker about it, but that wasn't what the policy said needed to be done. And for the protection of an employer and balancing these interests, that policy has to be followed so that we're aware when something like this occurs. It wasn't until after Paschall left, and you can see that in the timing of the affidavit, in the last part of the declaration when she says, I eventually met with Tracy Girth and I insisted that a complaint be made. But by then it was too late to help in this particular situation, and certainly shows that there was nothing that we knew about Mr. Banach other than he had created conflicts with other employees. And indeed, when Ms. Paschall brought the concerns to our attention, there was a thorough investigation, and Mr. Banach was given a warning. And fortunately, even though what she said didn't involve race or sex, what the company did in response to her complaint did cover the issues at play. Because what happened was he was given a warning that said keep your comments relevant to work and work-related topics. Keep your personal issues to yourself. Make sure that you're not using profane or provocative language around co-workers. This revolves around profane statements that he made for purposes of summary judgment to Ms. Paschall on her first day. We expect you to change your approach or else further discipline will result. It was effective. They were separated that day, and never again did she face any concerns relative to Mr. Banach. And this court has made it very clear that the most important fact supporting the position that the company took reasonable steps to prevent recurrence was that there was no recurrence. And that was made in the case Sutherland v. Walmart stores in 2011. With respect to Ms. Odom, that is equally so onerous for an employer that no one could expect that tube processing would have thought that an incident seven years previously involving Ms. Odom, when she used the N-word to describe a Brazilian nut, would resurface seven years later such that she was a racist or somehow that she shouldn't have been assigned to do some training with respect to Ms. Paschall. It simply doesn't exist. And I think what's telling in terms of an unreasonable expectation in this case is an argument made in the reply brief by the plaintiff's counsel. On its own, Barb Odom's reference to NTOs is sufficient to have created a racially hostile environment. That leads to the faulty conclusion that counsel made, which was that we argued somehow and the court below somehow decided that as a matter of law, two incidents are insufficient to create a severe or pervasive work environment of hostile harassment. No, these two incidents were insufficient as a matter of law. The N-word used for the Brazilian nut and the horrible comment, two comments that Mr. Banach made to Paschall on her first day of work. With respect to Ms. Odom, the company undertook a full investigation as quickly as the N-word issue came up. You'll see in the record that many witnesses were talked with relative to this issue that the initial consideration was going to be that she would be terminated, but the company thought that what would be effective under these circumstances was that she would be severely reprimanded. She had a three-day suspension, and she was told that if she ever did anything like this again, she would lose her job. That turned out, as the case with Banach, to be fully effective. Never again did Ms. Paschall or anyone else that we're aware of in this workplace suffer from Ms. Odom's indiscretion of using the N-word under those circumstances. But that does not, A, arise to a severe or pervasive level, and secondly, this company did everything it possibly could to prevent the harassment in the first place and then to remedy the harassment by making sure that there would be no recurrence. I think a telling way to conclude from our standpoint is to look at what Ms. Paschall argued happened to her that she thought was caused by her race when she was taken to a new area, given an opportunity to work under a new supervisor, totally removed from anybody that she complained about in the past. And when she met that supervisor, she surreptitiously recorded meeting. And she says that he didn't shake her hand. He looked at her hand like it was something filthy. And she said that was caused by race. That's just another instance of racial harassment. That's the kind of thing that this court cannot permit to underlie cases like this. The bulk of plaintiff's arguments in this case are presented on such generalized feelings that anything even slightly unpleasant that happened to these two plaintiffs or two processing, they blamed on race. So if they didn't get overtired, yes, they blamed that on race. So we would ask that you would affirm Judge Magnus Stinson's decision in this case. Thank you, Your Honor. Anything further, Mr. Macy? Just briefly, Your Honor. Real briefly. I don't think the court, as a matter of law, needs to indulge Barb Odom's fiction that she was merely referring to Brazil nuts when she was making these comments. Second, I'd ask the court to look at docket 44-4, page 9 and 10. That's Ms. Paschall's deposition. She testified specifically about the complaint she made about Benash. It wasn't resolved the same day. Third, Ms. Paschall worked there less than two months. Her first trainer made terrible derogatory comments to her based on her race and her sex. Her second trainer made racist comments. The defendant's contention that she's somehow irrational to perceive racism in the conduct of other supervisors I think is a jury issue. I think there's plenty of evidence from which she could say that the environment that she was immediately exposed to at the defendant's company was filled with hostility towards her based on her race and sex. Finally, defendant refers to docket 44-6, which is the warning notice to Mr. Benash. Nowhere in that, despite the evidence that I've discussed from Ms. Paschall's deposition and indeed evidence from defendant's team leader Josh Combs and even Barb Odom himself, nowhere in this does it mention any type of race or sex discrimination. The warning is silent on this. If you look at Ms. Phillips' declaration, Ms. Phillips testified that when she reported Benash's conduct all the way up to Tracy Gerth, Tracy Gerth was shocked by the conduct. And that is despite the fact that allegedly the prior year there had been a write-up about this. I think a jury could conclude from the defendant's treatment of Mr. Benash that simply because racism and sexism weren't in the disciplinary records produced by the defendant, that doesn't mean that the defendant was not aware that those existed. Thank you. Thank you, counsel. The case is taken under advisement.